**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

S.J. AMOROSO CONSTRUCTION CO., INC.,

    Plaintiff,

v.

EXECUTIVE RISK INDEMNITY INC., *et al.*,

    Defendants.

No. C 06-2572 SBA

**ORDER**

[Docket No. 45]

Before the Court is defendant Executive Risk Indemnity Inc.'s Motion for Summary Judgment/Alternative Motion for Partial Summary Judgment [Docket No. 45]. After reading and considering the arguments presented by the parties, the Court finds this matter appropriate for resolution without a hearing. *See* FED. R. CIV. P. 78. For the reasons that follow, the Court GRANTS the defendant's motion for summary judgment.

### BACKGROUND

This is an insurance coverage action brought by plaintiff S. J. Amoroso Construction Co., Inc. (Amoroso) against Executive Risk Indemnity Inc. (Executive Risk). Executive Risk contends there is no coverage under the policy issued to Amoroso due to the exclusion from coverage "based upon, arising from, or in consequence of any actual or alleged liability of [Amoroso] under any written or oral contract or agreement."

The dispute over coverage arises from a lawsuit (the Mauna Kea litigation) filed against Amoroso by Mauna Kea Properties (Mauna Kea) regarding a construction contract dispute between Mauna Kea and a limited liability company of which Amoroso owns 50 percent, DAP. The construction contract was initially entered into between Mauna Kea and Andrew L. Youngquist Construction, Inc. (ALY) on June 20, 2000. ALY is the other 50 percent owner of DAP. On January 1, 2001, ALY sought to assign the Mauna Kea contract to DAP. On January 30, 2001, DAP, through its managers, ALY, and Amoroso, agreed to the assignment and later sought Mauna Kea's consent. On March 9, 2001, in

1  response to the request for assignment, Mauna Kea sent a letter to ALY inquiring about the reasons for
2  the assignment. In a letter dated March 27, 2001, Paul Mason, then President of Amoroso, responded
3  to Mauna Kea's questions. Mason wrote that (1) "D.A.P. liability is assigned to both owners A.L.Y.
4  and [Amoroso];" (2) "[t]he purpose of D.A.P. is to have financial strength from both A.L.Y. and
5  [Amoroso]. Together [their] financial statements are much stronger than A.L.Y. alone;" and (3) "[s]ince
6  D.A.P. is owned by A.L.Y. and [Amoroso], it is a much more financially strong entity than ever before."
7  Pollack Dec., Ex. M at 95. On May 24, 2001, Mauna Kea consented to the assignment, asserting that
8  it relied, in part, on Mason's representations in doing so. Pollack Dec., Ex. M at 96. Amoroso now
9  maintains that Mason was not authorized to make the representations on behalf of Amoroso.

10  In 2002, Mauna Kea filed a lawsuit against DAP, ALY, and their subcontractors, claiming that
11  it had discovered material construction defects caused by the defendants. In November 2005, Mauna
12  Kea amended its complaint adding Amoroso as a defendant. The First Amended Complaint asserted
13  nine causes of action against Amoroso: (1) breach of construction contract; (2) breach of the implied
14  covenant of good faith; (3) negligence in performing the construction; (4) breach of implied and express
15  warranty in the construction; (5) negligent or intentional misrepresentation that, among other things,
16  Mauna Kea would benefit from the assignment of the contract to DAP because liability would be
17  assigned to both ALY and Amoroso; (6) gross negligence and willful misconduct in the performance
18  of the construction; (7) indemnity and defense pursuant to the terms of the construction contract; ((8)-(9)
19  do not pertain to Amoroso); (10) vicarious liability for DAP on an alter ego theory; and (11) promissory
20  estoppel on the grounds that, since Amoroso promised that the combined assets of Amoroso and ALY
21  could be used to satisfy any liability of DAP to Mauna Kea, Amoroso should be estopped from denying
22  liability for DAP's defective performance. Executive Risk Request for Judicial Notice, Ex. B.

23  In May 2005, prior to the First Amended Complaint, Amoroso notified Executive Risk of Mauna
24  Kea's written demand for money damages due to concern that it could be subjected to liability because
25  of Mason's representations. Executive Risk acknowledged receipt of the notice and advised Amoroso
26  that any future claim arising out of the circumstances reported would be considered to have been made

27
28

during the relevant policy period. On November 3, 2005, Mauna Kea filed a motion to amend its complaint to include claims against Amoroso. Amoroso then tendered the suit to Executive Risk. On November 10, 2005, Executive Risk requested documents and information from Amoroso to begin its investigation and evaluate whether the claim was covered under the Directors and Officers Policy. Amoroso complied with the request, forwarding to Executive Risk a copy of the amended complaint and letters dated March 9, 2001, March 27, 2001, and May 24, 2001, relating to Mason's statements that DAP's liability would be assigned to both ALY and Amoroso. Pollack Dec., Ex. L-M. On November 23, 2005, Executive Risk issued a determination that there was no coverage under the policy. The determination was based on a review of the complaint and the documents provided by Amoroso.

On March 7, 2006, Amoroso filed the present complaint in this Court against Executive Risk raising three causes of action: (1) breach of contract for Executive Risk's failure to investigate and pay Amoroso's losses in the Mauna Kea litigation; (2) breach of the covenant of good faith and fair dealing; and (3) declaratory relief that the Executive Risk policy covers the Mauna Kea litigation. The Mauna Kea lawsuit settled in December 2006. Amoroso paid $810,000 in connection with the settlement and seeks to recover this sum plus consequential damages.

## LEGAL STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment must demonstrate that there are no genuine issues of material fact. *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). An issue is "material" if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

In responding to a properly supported summary judgment motion, the non-movant cannot merely

rely on the pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002); *Federal Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).

**ANALYSIS**

**1.    Executive Risk's Duty to Indemnify**

Executive Risk provided insurance coverage for Amoroso's directors and officers under Policy No. 8169-5675 (D & O Policy). "D & O insurance is 'a specialized form of coverage for (i) claims against corporate directors and officers based on acts committed in their corporate capacities; [and] (ii) the corporation's indemnification obligations to its directors and officers for such claims . . . .'" *August Entm't, Inc. v. Philadelphia Indem. Ins. Co.*, 146 Cal. App. 4th 565, 573 (2007) (citation omitted; alteration in original). "D & O policies typically exclude coverage for breach of contract." *Id*. at 576. It is this typical coverage exclusion that Executive Risk relies upon here.

The relevant insuring clause of the D & O Policy provides that Executive Risk is obligated to pay loss on behalf of Amoroso resulting from claims made during the relevant policy period for wrongful acts. Pollack Dec., Ex. D at 26. A "wrongful act" is defined as "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted" by an "insured organization." Pollack Dec., Ex. D at 30. The "insured organization," is, of course, Amoroso. Exclusion III(C)(2) provides that no coverage is available for claims:

> based upon, arising from, or in consequence of any actual or alleged liability of an Insured Organization [Amoroso] under any written or oral contract or agreement, provided that this Exclusion III(C)(2) shall not apply to the extent that an Insured Organization [Amoroso] would have been liable in the absence of the contract or

4

agreement.

Pollack Dec., Ex. D at 32.

As will be seen, Executive Risk has demonstrated that this exclusion applies to Amoroso's claim for coverage arising from the Mauna Kea litigation.

### a.   Coverage for an Officer Acting Outside the Scope of His Authority

Here, three of the causes of action Mauna Kea asserted against Amoroso, (1) negligent or intentional misrepresentation; (2) gross negligence and willful misconduct; and (3) promissory estoppel, are tort claims based on the statements that Amoroso's president, Paul Mason, made to Mauna Kea concerning Amoroso's financial responsibility for DAP.  These representations, if made on behalf of Amoroso, could constitute a "wrongful act" by an "insured organization" within the terms of the policy. However, Amoroso vigorously maintains that Mason's statements were not authorized by the organization and, as such, are "invalid as an ultra vires act" and unenforceable against Amoroso. Opp. at 7-8. Dana McManus, President and Chief Executive Officer of Amoroso has submitted a declaration stating "Paul Mason was not authorized to make the representations contained in his letter of March 27, 2001, to William Mielcke of Mauna Kea Properties, Inc."  McManus Decl., at ¶ 3.

In Executive Risk's view, the statements were therefore not made by an "insured organization." Instead, they were made by Mason in his individual capacity.  Accordingly, since Mauna Kea asserted claims against Amoroso as an organization, triggering only the "insured organization" insuring clause, and Amoroso disclaims any responsibility for Mason's statements,  these claims are not within the policy's terms.

Executive Risk's interpretation finds support in a recent case decided by a California appellate court.  In *August Entertainment, Inc. v. Philadelphia Indemnity Ins. Co.*, 146 Cal. App. 4th 565, 576 (2007), the court found that, under a D & O policy very much like the one in this case, the policy limited coverage for directors and officers to liability arising from errors committed in their official capacity, but not for an officer who breached a contract acting in his personal capacity. An officer of a company known as InternetStudios (which had a D & O policy from defendant Philadelphia Indemnity Ins. Co.)

purported to enter into a contract with plaintiff August Entertainment on behalf of InternetStudios. InternetStudios later disclaimed the validity of the contract, contending that the officer acted outside the scope of his authority. Defendant Philadelphia Indemnity denied coverage under the D & O policy for the actions of the officer, because that officer acted in an individual capacity in entering into the contract, and not as an officer of InternetStudios. The appellate court reasoned that the D & O insurance covered claims against directors and officers acting in their official capacity, so if the InternetStudios's officer was acting outside the scope of this authority in entering into the disputed contract, he was therefore acting in an individual capacity, and the D & O policy did not apply. *August Entm't*, 146 Cal. App. 4th at 573-76, 582.

The D & O policy here provides coverage for a wrongful act committed by the Insured Organization, identified by the policy as Amoroso. Since it is Amoroso's position that the alleged wrongful act was not committed by it, but rather Mason, there is no coverage under the policy.

### b.    **The Contract or Agreement Exclusion**

The remaining causes of action against Amoroso in the First Amended Complaint in the Mauna Kea litigation were: (1) breach of construction contract; (2) breach of the implied covenant of good faith and fair dealing; (3) negligence in performing the construction; (4) breach of implied and express warranty in the construction; (7) indemnity and defense pursuant to the terms of the construction contract; and (10) vicarious liability for DAP on an alter ego theory. Executive Risk Request for Judicial Notice, Ex. B. Executive Risk asserts that coverage is precluded because Exclusion III(C)(2) excludes from coverage claims "based upon, arising from, or in consequence of any actual or alleged liability of an Insured Organization under any written or oral contract."

The first, second, forth, and seventh causes of action are clearly based on allegations of Amoroso's failure to meet alleged obligations under the Mauna Kea construction contract. Accordingly, they are squarely within the scope of Exclusion III(C)(2) and Executive Risk properly denied coverage of any liability under these claims.

With respect to the tort claims, Amoroso claims that they do not arise from the alleged breach

6

of contract. The attempt to divorce the tort claims from the contract action, however, fails both because "arising from" is given broad construction under California law and California courts have rejected similar attempts to separate tort claims from contract claims in similar D & O coverage cases.

The third cause of action, for negligence, alleges that Amoroso "breached [its] duty of care to [Mauna Kea] by negligently and defectively designing, constructing, inspecting, and supervising the Project and by not performing [its] work in accordance with the applicable plans and specifications, manufacturers' instructions, industry practices and in accordance with all laws, codes and regulations applicable to such work and services." Pollack Dec., Ex. B at 52-3. Executive Risk argues that this claim falls within Exclusion III(C)(2) because it arises from the Mauna Kea construction contract and Amoroso would not be liable in the absence of the contract. In support of its position, Executive Risk points out that California courts have held that the term "'arising out of' is a broad concept requiring only a slight connection or an 'incidental relationship' between the injury and the excluded risk'" *Southgate Recreation & Park Dist. v. Californian Ass'n for Park & Recreation Ins.*, 106 Cal. App. 4th 293, 303 (2003) (citing *Century Transit Sys. v. American Empire Surplus Lines Ins. Co.*, 42 Cal. App. 4th 121, 127 n.4 (1996)). Under this broad interpretation, the negligence claim would not be covered by the policy because the allegedly negligent work was performed pursuant to obligations and duties created by contract and, thus, bears a connection or relationship to the contract.

Amoroso argues that the negligence cause of action is a "separate and distinct tort claim" and does not "arise" from the construction contract. First, Amoroso argues that a broad interpretation of "arising" contravenes the California policy to construe insurance policy exclusions strictly in favor of the insured. However, notwithstanding this policy, California courts have interpreted similar exclusions broadly to encompass any claims that have a slight connection with a contract. For example, in *Southgate*, a park district contracted with a general contractor to build a golf course and the general contractor went bankrupt before completing the project. *Southgate*, 106 Cal. App. 4th at 296-297. Various unpaid subcontractors then sued the park district, asserting claims of conversion, breach of trust, and violation of stop notice, to recover payment for the goods and services they had provided on the

project. *Id.* at 297, 301. The park district then sought coverage from its insurer under a policy that, like Amoroso's, excluded coverage for any liability "arising out of or related to construction . . . contracts or to any other contract for the purchase of goods and services." *Id.* Noting that the "arising out of" language required the court to "examine the conduct underlying the . . . lawsuit, instead of the legal theories attached to the conduct," the California Court of Appeal held that the subcontractor's claims "fit comfortably" within the exclusion because they were based on the park district's alleged negligent administration of funds under the construction contract. *Id.* at 302. The court explained:

> The fact the subcontractors have alleged noncontractual theories [*i.e.*, tort claims] that Southgate acted negligently with respect to the construction funds or breached statutory duties regarding the adequacy of the surety bonds changes nothing. It is not the underlying claims' legal theories that control coverage and exclusions---it is their facts.

*Id.*

Similarly, here, the conduct underlying the negligence claim is construction work performed pursuant to a contract. The negligence claim is not a tort "independent from" the contract because the defective work underlying the claim would not have occurred absent the construction contract between DAP and Mauna Kea. Thus, following California precedent, the negligence claim is within the exclusion.

A recent federal court decision construing an identical, or nearly identical D & O policy bolsters this conclusion. In *Spirtas Co. v. Federal Ins. Co.*, 481 F. Supp. 2d 993, 997 (E.D. Mo. 2007), the court stated that

> [I]t is clear that MIG's [tort] claims for conversion, breach of express or implied trust, and unjust enrichment also fall within the Section III(C)(2) exclusionary clause, as they 'arise from' the alleged liability of Spirtas under the MIG Subcontract Agreement. Counts III, IV, and V are all based upon Spirtas's obligation under the Subcontract Agreement with MIG to pay Spirtas's own subcontractors. The Court concludes, that while causes of action for conversion, breach of trust, and unjust enrichment, hypothetically, are not contingent upon the existence of a contract, here all of MIG's claims against Spirtas arise from the Subcontract Agreement, and Spirtas would not have been liable to MIG under any of MIG's asserted theories of recovery in the absence of the Subcontract Agreement.

A California Court of Appeal decision offers further instruction. In *Medill v. Westport Ins. Corp.*, 143 Cal. App. 4th 819, 829-30 (2006), the court also rejected the fact that claims asserted sounded in tort rather than contract meant that they did not arise out of a breach of contract claim. The

8

*Medill* court noted that

> [T]he directors' and officers' potential liability would not exist without the contracts Heritage and the Heritage entities entered into in connection with the issuance and financing of the bonds. All of the allegations against the directors and officers arise out of duties and obligations Heritage and the Heritage entities assumed under the bond contracts. The claims are therefore excluded from coverage.

*Id.* at 830.

The *Medill* court dismissed the argument that the tort claims were independent of any breach of contract claim, stating that:

> Here, the tort claims against the directors and officers are not independent of the breach of contract claims. No aspect of the underlying bond litigation would exist without the alleged breaches of the loan agreements and indentures and the contractual obligations to pay on the bonds. Without the breaches of the contractual obligations to make repayments on the bonds, there would have been no loss to the bondholders and no recovery against the directors and officers for mismanagement, negligence or breach of fiduciary duty.

*Id.* at 831.

Amoroso attempts to distinguish the present case from *Southgate*, *Medill*, and *Spirtas* by asserting that the exclusion applies only to contracts to which the insured is a party. Since it contends that it was not a contracting party, Exclusion III(C)(2) should not preclude coverage of claims arising from DAP's contractual obligations. This distinction is not persuasive. First, Executive Risk makes the convincing point that "a reading of each case [*Spirtas*, *Southgate*, and *Medill*] makes clear that [those courts'] analysis was not premised upon the fact that the insured was a party to the contract. Rather, it was premised upon the fact that the alleged liability of the insured arose from a contract." Docket No. 72, at 5 n.3. The relevant language of the policy supports this: Exclusion III(C)(2) excludes coverage for any claim against Amoroso "based upon, arising from, or in consequence of any actual or *alleged liability* of an Insured Organization under any written or oral contract or agreement . . . ." (emphasis supplied).

Moreover, Amoroso cites no authority for its position and such an interpretation of the exclusion is illogical. Specifically, if the insurer sought to narrow coverage by excluding liability resulting from the insured's contractual obligations, it is unreasonable to infer that it nonetheless intended to provide

9

coverage for liability flowing from a third party's contracts. Moreover, Exclusion III(C)(2) precludes coverage for liability "under *any* written or oral contract or agreement." (emphasis supplied). This language encompasses both the insured's contracts and the contracts of third parties. For the same reasons, interpreting Exclusion III(C)(2) to preclude coverage for liability flowing from a third party's contractual obligations is consistent with the rule that "[t]he understanding of an ordinary person is the standard used in construing a contract of insurance." *See Arenson v. National Auto. & Cas. Ins. Co.*, 45 Cal. 2d 81, 83 (Cal. 1955).

Finally, the tenth cause of action alleges that Amoroso is liable for DAP's breach of contract, negligence, and other acts and omissions because DAP was merely an alter ego of Amoroso and ALY. Pollack Dec., Ex. B at 31-32. Any derivative liability resulting from this claim would arise from DAP's failure to adequately perform under the contract. Thus, it too is within Exclusion III(C)(2).

Accordingly, the Mauna Kea litigation claims asserted against Amoroso fell comfortably within the "contract or agreement" exclusion and therefore outside the coverage offered by the policy. Summary judgment on this issue is warranted.

**2.     Covenant of Good Faith and Fair Dealing**

In addition to advancing a breach of contract claim based on Executive Risk's failure to properly investigate its claim and provide coverage in the underlying suit, Amoroso's complaint further alleges that Executive Risk's conduct constitutes a breach of the covenant of good faith and fair dealing. California law implies a covenant of good faith and fair dealing in every contract. *Hydro Systems, Inc. v. Continental Ins. Co.*, 929 F.2d 472, 477 (9th Cir. 1991). This covenant demands that each contracting party "'refrain from doing anything to injure the right of the other to receive the benefits of the agreement.'" *Id.* (quoting *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979)). Under an insurance contract, the implied covenant requires that the insurer conduct a reasonable investigation into the insured's claim, as "an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation or its denial." *Hydro Systems, Inc.*, 929 F.2d at 477.

1 "A court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." *Lunsford v. American Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994).

Amoroso alleges that Executive Risk breached the covenant by, among other things, "failing to evaluate Amoroso's tender pursuant to well-established case law and the terms of the policy" and "failing to properly investigate potentially covered claims." Notice of Removal, Ex. A at 11 [Docket No. 1]. Amoroso states that Executive Risk's conduct was unreasonable because it failed to investigate the factual bases of the allegations in Mauna Kea's amended complaint and did not participate in court-ordered mediation.

Amoroso' claim must fail because a claim for breach of the implied covenant or bad faith cannot be maintained unless policy benefits are due under the contract. *See, e.g., Waller v. Truck Ins. Exch. Inc.*, 11 Cal. 4th 1, 35-36 (1995). As discussed above, no benefits were due Amoroso under the D & O policy.

Moreover, Executive Risk has adduced evidence that its investigation was more than a cursory evaluation of the complaint and the policy. Specifically, it contacted Mason, discussed the lawsuit with Amoroso's counsel, requested and reviewed additional information from Amoroso regarding Mason's statements, and reviewed the construction contract. Reply at 12. Additionally, the court-ordered mediation session required insurers to attend only if they had "liability exposure." Pollack Dec., Ex. BB. The order was issued on September 19, 2005, before Amoroso was named as a defendant. Accordingly, since no claim had been made against Amoroso, Executive Risk had no liability exposure. Thus, since Executive Risk conducted a reasonable investigation and based its refusal on that information and a reasonable construction of the policy, it did not act in bad faith. *See Lunsford*, 18 F.3d at 656. Executive Risk's motion for summary judgment on this claim is granted.

### 3.     **Defense Costs**

Amoroso's complaint seeks recovery for the costs of defending the Mauna Kea lawsuit.

11

Executive Risk seeks summary adjudication that it is not liable for these costs.

In response to interrogatories propounded by the Executive Risk, Amoroso repeatedly stated that "Amoroso does not contend that ERII [Executive Risk] is responsible for any defense costs incurred in the defense of Amoroso of the Mauna Kea Lawsuit." Kokes Decl., Ex. P, at 15. In response to requests for the production of documents, Amoroso declared that "Amoroso is withdrawing all claims for defense costs associated with the underlying litigation." Kokes Decl., Ex. R, at 32. Despite not having formally amended its complaint, the Court finds that based on these representations, Amoroso has effectively withdrawn its claim for recovery of costs of defending the Mauna Kea lawsuit. Executive Risk is therefore entitled to summary judgment on any claim for costs of the defense.

## CONCLUSION

Accordingly, the Court GRANTS Executive Risk's Motion for Summary Judgment [Docket No. 45].

IT IS SO ORDERED.

October 30, 2007

                                        *Saundra B Armstrong*
Saundra Brown Armstrong
United States District Judge