1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7            FOR THE NORTHERN DISTRICT OF CALIFORNIA
8                          OAKLAND DIVISION
9

10  S.J. AMOROSO CONSTRUCTION            Case No:  C 06-2572 SBA
    COMPANY, INC., a California corporation,
11                                       **ORDER GRANTING IN PART AND
                 Plaintiff,              DENYING IN PART PLAINTIFF
12                                       AND DEFENDANT'S CROSS-
            vs.                          MOTIONS FOR SUMMARY
13                                       JUDGMENT**
    EXECUTIVE RISK INDEMNITY, INC.,  a
14  Delaware Corporation,                Docket 105, 111

15               Defendant.

16

17          The instant insurance coverage arises from Defendant Executive Risk Indemnity, Inc.'s

18  ("Executive Risk") refusal to defend or indemnify its insured, Plaintiff S.J. Amoroso

19  Construction Company, Inc. ("Amoroso"), in an underlying state court construction defect

20  lawsuit.  The Court previously granted summary judgment for Executive Risk, which the Ninth

21  Circuit Court of Appeals reversed in part, affirmed in part, and remanded for further

22  proceedings.

23          The parties are presently before the Court on the parties' cross-motions for summary

24  judgment pertaining to the limited issues set forth in the Ninth Circuit's mandate.   (Docket 93,

25  94.)  Having read and considered the papers filed in connection with this matter and being fully

26  informed, the Court hereby GRANTS IN PART and DENIES IN PART both motions, for the

27  reasons set forth below.  The Court, in its discretion, finds this matter suitable for resolution

28  without oral argument.  See Fed.R.Civ.P. 78(b).

# I.  BACKGROUND

## A.  THE UNDERLYING DISPUTE

### 1.  The Mauna Kea Construction Project

On June 20, 2000, Mauna Kea Properties, Inc. ("Mauna Kea"), a real estate developer, entered into a contract with Andrew L. Youngquist Construction Company ("ALY") to build condominiums in Hawaii as part of a development known as The Uplands at Mauna Kea ("the Project").  (Def.'s Request for Jud. Notice ("RJN") Ex. B.)  The contract, which was to be performed in phases, included a provision that: "If  Contractor wishes to assign the construction contract, it must obtain prior written consent from the Owner [Mauna Kea]."  (Id.)

After commencing construction, ALY and Amoroso, jointly formed a new construction company known as DAP Construction LLC ("DAP").  In February 2001, ALY and DAP sought permission from Mauna Kea to assign the performance of Phase III of the Project from ALY to DAP.  (Pl.'s RJN, Ex. 54-77 at 65.)  In response, on March 9, 2001, Mauna Kea sent ALY a letter requesting additional information regarding the reasons ALY and DAP were requesting permission for the assignment.  (Id. at 65-66.)  The letter stated, in pertinent part:

> Dear Andy:
>
> You have requested that Mauna Kea Properties, Inc., the developer of The Uplands at Mauna Kea, consent to the assignment of the construction contracts from Andrew L. Youngquist Construction, Inc., to DAP Construction LLC.  This is a response to your request.
>
> Please provide us with the following information to help us understand your request for assignment:
>
> 1.  The Unanimous Written Consent of the Directors of Andrew L. Youngquist Construction, Inc., provides as following in WHEREAS clause number three: "WHEREAS, the Corporation believes that it is in the best interest for administrative cost segregation and liability protection."  What does the phrase "administrative cost segregation" mean?  What does the phrase "liability protection" mean?
>
> 2.  Is the purpose of the proposed assignment to insulate or protect Andrew L. Youngquist Construction, Inc. and the principals of that corporation from potential liability?

3.  What assets does DAP Construction, LLC have?

4.  Will Andrew L. Youngquist, Inc. continue as an on-going entity?

5.  Is it the intent that DAP Construction, LLC be used for any purpose other than to complete construction of the projects at The Uplands at Mauna Kea?

6.  Does DAP Construction, LLC have the same financial wherewithal and capability as Andrew L. Youngquist to protect the interests of Mauna Kea Properties, Inc.?

(Id. (emphasis added).)

On March 27, 2001, Paul Mason ("Mason"), then President of Amoroso, responded in writing to Mauna Kea's inquiry.  (Id. at 67.)  In a one-page letter, Mason responded as follows:

Dear Bill:

This is in response to your questions regarding your assignment of the construction contracts to D.A.P.

1.)   What does the phrase "administrative cost segregation" mean?

What does the phrase "liability protection" mean?

D.A.P. is a separate entity.  Separate cost controls are being kept apart from A.L.Y. and S.J.A. – not individuals

2.)   The purpose of D.A.P. is to have financial strength from both A.L.Y. and S.J.A.  Together our financial statements are much stronger than A.L.Y. alone.

3.)   D.A.P. Construction is owned 50% by A.L.Y. and 50% by A.J. Amoroso.  Our combined assets are in excess of $10 million.

4.)   Yes, A.L.Y. will continue as an on-going entity.

5.)   D.A.P. Construction's intent is to complete the Mauna Kea projects and then potentially continue to look for additional work in the future.

6.)   D.A.P. Construction has a joint financial statement of A.L.Y. and S.J.A.

Please remember that the Mauna Kea project is a bonded project secured by A.J. Amoroso's bonding capacity.  Since D.A.P and is owned by A.L.Y. and S.J.A., it is a much more financially strong entity than ever before.

If you have any questions, please give me a call at . . . .

Sincerely,

S.J. AMOROSO CONSTRUCTION, INC.

Paul Mason
President

(Id.)[1]

On May 24, 2001, Mauna Kea sent a letter addressed to both ALY and Amoroso approving the request for assignment. Mauna Kea stated:

> Dear Andy and Paul:
>
> This is in response to your request to assign the construction contracts for the construction of single family dwellings and condominiums at The Uplands at Mauna Kea from Andrew L. Youngquist Construction Company, Inc. to DAP Construction, LLC.
>
> Based on your representations made in the February 1, 2001 (sic) from Steve Kemnitzer to Mauna Kea Properties; the Uniform Written Consent of the Directors of the Andrew L. Youngquist Construction Company, Inc.; the Written Consent of the Managers of DAP Construction, LLC; the Rider to the Performance and Payment Bonds issued by American International Companies; the Performance and Payment Bonds; the Certificate of Insurance with Additional Insured Attachment naming Mauna Kea Properties, Inc. (agent for Mauna Kea Development Corporation) as an additional insured; and the representations made by Mr. Mason in his letter to me dated March 27, 2001, your request is hereby approved.
>
> It is our understanding that DAP Construction, LLC will be backed by the combined strength of both Andrew L. Youngquist Construction Company, Inc. and S.J. Amoroso Construction Co., Inc. and the performance and payment bonds will remain in full force. We look forward to the completion of The Uplands at Mauna Kea project with the combined efforts of both of you, Andy and Paul and Dana McManus.

(Id. at 68 (emphasis added).) Mauna Kea's letter made no mention of any offer by Amoroso to guarantee DAP's liability under the construction contract to complete the Project.

---

[1] The parties and court of appeal interchangeably refer to the March 27, 2001 letter, as "Mason's letter" and "Amoroso's letter." For sake of clarity, the Court notes that they refer to the same letter.

## 2. The Mauna Kea Lawsuit

On April 7, 2004, Mauna Kea filed suit in Hawaii state court against ALY, DAP and various subcontractors for alleged defects in the construction of the Project. (Pl.'s RJN, Ex. 48.)[2] Though not yet named as a party-defendant, Amoroso, anticipating its involvement in the action, tendered the Mauna Kea complaint to Executive Risk, pursuant to its Power Source Policy, No. 8169-575 ("the Policy"). (Id., Ex. 53-3.) Executive Risk acknowledged the tender, but responded that "coverage for this matter has not been triggered under the Policy" because no "Claim" had yet been made against Amoroso. (Id., Ex. 53-7 at 1, 5.)

On November 3, 2005, Amoroso notified Executive Risk that Mauna Kea had filed a motion for leave to amend its complaint, and that the proposed amended complaint joined Amoroso as a party-defendant. Leave to amend was granted and Mauna Kea filed its First Amended Complaint in which Amoroso was named as a defendant in the causes of action for: (1) Breach of Contract (Count One); (2) Good Faith and Fair Dealing (Count Two); (3) Negligence (Count Three); (4) Breach of Warranty (Count Four); (5) Negligent or Intentional Misrepresentation (Count Five); (6) Gross Negligence, Willful Misconduct (Count Six); (7) Indemnity and Defense (Count Seven); (8) Vicarious Liability - Alter Ego Theory (Count Ten); and (9) Promissory Estoppel (Count Eleven).[3] (Id., Ex. 63.) The fifth count for misrepresentation alleged that ALY and Amoroso misrepresented that DAP would be responsible for completing the project, that Mauna Kea would benefit from the assignment "since any liability arising from the Project would be assigned to both ALY and [Amoroso]," and that Mauna Kea relied on such representations to its detriment. (Id. ¶¶ 85-87.)

On November 10, 2005, Executive Risk confirmed the tender of the First Amended Complaint and requested documents and information from Amoroso to begin its investigation and evaluate whether the claim was covered. (Pollack Decl. Ex. K.) Executive Risk

---

[2] Mauna Kea Properties, Inc. v. Andrew L. Youngquist Construction, et al., State of Hawaii, Circuit Court, Case No. 04-1-0104K.

[3] Amoroso was not named as a defendant in the eighth and ninth causes of action for negligence per se and negligence.

subsequently notified Amoroso in writing that it was denying coverage by letter, dated November 23, 2005.  (Id. Ex. N.)  The letter explained, inter alia, that "[t]he First Amended Complaint does . . . appear to constitute a **Claim** for a **Wrongful Act** against an **Insured Organization**, as these terms appear in the [Directors & Officers Liability Coverage Section of the] Policy . . . ."  (Id. at 7 (emphasis in original).)  However, Executive Risk asserted that Mauna Kea's claims were subject to Exclusion III(A)(4), which excluded coverage for claims for damage to tangible property.  (Id. at 9.)  Also cited was Exclusion III(C)(2), which excludes coverage for "any actual or alleged liability of an **Insured Organization** under any written or oral contract or agreement . . . ."  (Id. (emphasis in original).)

In the meantime, Amoroso tendered the Mauna Kea action to another insurer, St. Paul Travelers Fire & Marine Insurance Company ("St. Paul"), under its comprehensive general liability policy.  (Kokes Decl. II Ex. 1.)  Unlike Executive Risk, St. Paul agreed to defend and indemnify Amoroso, subject to a reservation of rights.  (Barrister Decl. Ex. A.)  St. Paul construed its policy as providing coverage for Mauna Kea's "property damage" claims, and disclaimed "any liability for indemnity for damages" for non-property damage claims, including the claim based on Mason's alleged misrepresentations.  (Id. at 10.)  The Mauna Kea litigation eventually resolved in December 2006, with Amoroso agreeing to pay Mauna Kea $810,000 to settle Mauna Kea's claims insofar as they were based on the misrepresentations made by Mason in his March 27, 2001 letter to Mauna Kea.  (McManus Decl. ¶ 2.)[4]

---

[4] The $810,000 figure is stated in the declaration of Dana McManus, President and Chief Operating Officer of Amoroso, and is supported by a photocopy of a check in that amount made payable to the Mauna Kea Development Corporation.  (McManus Decl. ¶ 1-2 and Ex. A.) Executive Risk objects to McManus' declaration, claiming that the best evidence of the amount paid in settlement is the actual settlement agreement, which purports to show that Amoroso, ALY and DAP's jointly paid $3,745,000 as part of the global settlement. (Parrent Decl. Ex. B at 25, Docket 142.)  For purposes of the instant motions, the actual amount paid by Amoroso is immaterial.  Therefore, Executive Risk's objection (Docket 144) to the McManus Declaration is overruled as moot.

**B.** **PROCEDURAL HISTORY**

    **1.** **Overview of Amoroso's Claims**

On March 7, 2006, Amoroso filed the present action against Executive Risk in San Mateo Superior Court. The Complaint alleges three causes of action for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) declaratory relief. In their breach of contract claim, Amoroso avers that Executive Risk "breached [its] obligation to Plaintiff under the . . . Policy by inadequately investigating the allegations against Amoroso and failing to pay Loss on behalf of Amoroso in <u>Mauna Kea Properties v. Dap et al.</u>, thereby denying Plaintiff of benefits to which it was entitled under the . . . Policy." (Compl. ¶ 32.) Amoroso's second claim for "bad faith" alleges that Executive Risk unreasonably denied benefits under the Policy. (<u>Id.</u> ¶ 36.) Finally, in its claim for declaratory relief, Amoroso seeks a determination Executive Risk is obligated under the Policy to pay Amoroso for the Loss and other compensatory damages incurred as a result of the <u>Mauna Kea</u> action. (<u>Id.</u> ¶¶ 40-42.) On April 14, 2006, Executive Risk removed the action to this Court on the basis of diversity jurisdiction.

    **2.** **The Court's Summary Judgment Ruling**

On October 30, 2007, the Court granted Executive Risk's Motion for Summary Judgment. (Docket 45.) First, the Court found there was no coverage as to Mauna Kea's claims for misrepresentation, negligence/willful misconduct or promissory estoppel, which were based on Mason's misrepresentation in his March 27, 2001 letter to Mauna Kea, which he ostensibly sent on behalf of Amoroso. Finding that Mason made those statements in his personal capacity, the Court concluded that Insuring Clause I(C) was not triggered because the claim was not made against an "Insured Organization." (Docket 80 at 5-6.) Second, the Court found that the other claims alleged by Mauna Kea arose from the construction contract and therefore were subject to Exclusion III(C)(2) which excluded coverage for claims "based on, arising from, or in consequence of any actual or alleged liability of an Insured Organization

under any written or oral contract." (Id. at 6-10.)[5]  Finally, the Court granted summary judgment in favor of Executive Risk on Amoroso's claim for breach of the implied covenant of good faith and fair dealing on the ground that there could be no bad faith as a matter of law because there was no coverage under the Policy, and that the record otherwise showed that Executive Risk performed "more than a cursory evaluation of the complaint and the policy." (Id. at 11.)  Amoroso appealed the Court's ruling.

### 3. The Ninth Circuit's Decision

On April 9, 2009, the Ninth Circuit Court of Appeals affirmed in part and reversed in part.  (Docket 93.)  Specifically, the court held that "[t]he district court erred by ruling that Amoroso was not entitled to coverage under the D&O Policy for claims stemming from Paul Mason's alleged misrepresentations because he acted in his individual capacity, and not on behalf of the insured organization. . . .  Based on the record before us, we cannot conclude that Mason's acts were so 'unusual or startling' that they should be classified as actions taken in his individual capacity."  Slip Op. at 2.  Thus, the panel concluded that Mason's conduct was sufficient to trigger Insuring Clause I(C).  Id. at 3.

Next, the Ninth Circuit considered this Court's analysis of the Policy Exclusions.  The court explained:  "Though Mason's alleged misrepresentations fall within the scope of Insuring Clause I(c), we must consider whether the D&O Policy's exclusion of coverage for claims arising from contract or agreement applies."  Id.  The court then found that the contract between Mauna Kea and DAP "cannot form the basis for a complete exclusion of coverage under Exclusion III(C)(2)," since Amoroso was not a party to that contract and therefore "did not have any liability under the contract (when Mauna Kea allegedly thought that Amoroso would)."  Id.  However, the court noted that Exclusion III(C)(2) could apply to the extent that

[5] Exclusion III(C)(2), which is set forth in the Directors & Officers Liability Coverage Section of the Power Source Policy ("D&O Policy"), provides that:  "No coverage will be available under Insuring Clause (C) for any **Insured Organization Claim**:  [¶] (2) based upon, arising from, or in consequence of any actual or alleged liability of an **Insured Organization** under any oral or written agreement, provided that this Exclusion (C)(2) shall not apply to the extent that an **Insured Organization** would have been liable in the absence of the contract or agreement."  (Compl. Ex. A (emphasis in original).)

the exchange of correspondence between Mason and Mauna Kea constituted a contract or agreement by Amoroso to guarantee DAP's performance of the construction contract in the event the assignment were approved. The court stated:

> There remains a triable issue of fact, however, about whether the correspondence between Mason and Mauna Kea Properties concerning the potential assignment of the construction contract created a separate contract or agreement under which any potential liability on the part of Amoroso would be excluded from coverage. <u>On remand, the district court should consider whether, under California law, the letter correspondence amounted to a contract or agreement by Amoroso to, in effect, guarantee DAP's performance of the construction contract. If it did, Executive Risk permissibly denied coverage pursuant to Exclusion III(C)(2) to the extent that Amoroso's liability arose under the letter correspondence.</u>

<u>Id.</u> at 4 (emphasis added).

Finally, the Ninth Circuit affirmed the grant of summary judgment on Amoroso's bad faith claim, holding that "the district court . . . did not err in granting summary judgment to Executive Risk on Amoroso's claim of bad faith due to Executive Risk's denial of coverage." <u>Id.</u> However, the court indicated that this Court should consider whether Amoroso had stated a viable claim for bad faith based on Executive Risk's denial of its duty to defend. In that regard, the court stated that "<u>[w]e leave it to the district court to determine in the first instance whether Amoroso has stated a claim of bad faith based on a breach of the duty to defend, and if so, whether Amoroso should prevail on such a claim.</u>" <u>Id.</u> at 4-5 (emphasis added).

### 4. The Cross-Motions for Summary Judgment

Following remand by the Ninth Circuit, this Court conducted a Case Management Conference, at which the parties indicated their desire to file cross-motions for summary judgment as to the issues specified in the court of appeal's mandate. Thus, the motions before the Court address: (1) whether the correspondence between Mason and Mauna Kea concerning the potential assignment of the construction contract amounted to a contract or agreement by Amoroso to, in effect, guarantee DAP's performance of the construction contract; and

(2) whether Amoroso has presented a viable claim for bad faith based on Executive Risk's failure to defend Amoroso in the Mauna Kea action.[6]

## II.    LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

An issue of fact is "material" if, under the substantive law of the case, resolution of the factual dispute might affect the outcome of the claim.  See Anderson, 477 U.S. at 248.  Factual disputes are genuine if they "properly can be resolved in favor of either party."  Id. at 250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).  Only admissible evidence may be considered in ruling on a motion for motion for summary judgment.  Fed.R.Civ.P. 56(e); Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

---

[6] Executive Risk filed evidentiary objections to certain of the declarations submitted by Amoroso in connection with the instant motions.  (Docket 132, 144.)  Because none of the evidence to which Executive Risk objects is material to the instant disposition, the Court overrules the objections as moot.

# III.   DISCUSSION

## A.   BREACH OF CONTRACT

Amoroso's first cause of action alleges that Executive Risk breached the Policy at issue by failing to provide coverage for the claims alleged against Amoroso in the Mauna Kea action.  "The first step in any insurance coverage dispute is to determine whether the insuring provisions of the policy afforded coverage for the alleged losses."  Davis v. Farmers Ins. Group, 134 Cal.App.4th 100, 105 (2005).  If an insuring clause is triggered, the question then becomes whether there are applicable exclusions precluding coverage.  Id. at 106.  Exclusions are construed narrowly.  See Delgado v. Interinsurance Exch. of Auto. Club of S. Cal., 47 Cal.4th 302, 313 (2009).   Where an insurer seeks summary judgment on the basis of on a policy exclusion, the insurer "must show by undisputed evidence" that the exclusion applies. State v. Allstate Ins. Co., 45 Cal.4th 1008, 1022 (2009).

As noted, the Ninth Circuit's mandate recognized that "though Mason's alleged misrepresentations fall within the scope of the Insuring Clause I(C), we must consider whether the D&O Policy's exclusion of coverage for claims arising from a contract or agreement applies."  Slip. Op. at 3.  Thus, the threshold question presented by the parties' respective summary judgment motions is "whether, under California law, the letter correspondence [between Mason and Mauna Kea concerning the potential assignment of the construction contract] amounted to a contract or agreement by Amoroso to, in effect, guarantee DAP's performance of the construction contract."  Slip. Op. at 4.  If so, under the Ninth Circuit's ruling, Executive Risk properly denied coverage based on the Exclusion C(III)(2); and if not, the Exclusion is inapplicable and Amoroso is entitled to coverage.[7]  Id.

---

[7] The Court notes that the Ninth Circuit's "indicates that there is a triable issue of fact . . . about whether the correspondence between Mason and Mauna Kea Properties concerning the potential assignment of the construction contract created a separate contract or agreement under which any potential liability on the part of Amoroso would be excluded from coverage."  Slip. Op. at 4.  However, because the facts presented by the parties and germane to the resolution of that issue are undisputed, the Court adjudicates this issue by way of the parties' cross-motions for summary judgment.

**1.     "Agreement" to Guarantee DAP's Performance**

Under California law, the essential elements of a contract are as follows: "1. Parties capable of contracting; [¶] 2. Their consent; [¶] 3. A lawful object; and, [¶] 4. A sufficient cause or consideration." Cal.Civ.Code § 1550; <u>U.S. ex rel. Oliver v. Parsons Co.</u>, 195 F.3d 457, 462 (9th Cir. 1999) (citing Civil Code § 1550). Absent conflicting extrinsic evidence, the issue of whether a contract was formed presents a question of law. See <u>Lopez v. Charles Schwab & Co., Inc.</u>, 118 Cal.App.4th 1224, 1229 (2004).

The parties' dispute focuses on the element of mutual consent. "The consent of the parties to a contract must be: [¶] 1. Free; [¶] 2. Mutual; and, [¶] 3. Communicated by each to the other." Cal.Civ.Code § 1565; <u>Weddington Prods., Inc. v. Flick</u>, 60 Cal.App.4th 793, 810-811 (1998). "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." Cal.Civ.Code § 1580. "California law is clear that there is no contract until there has been a meeting of the minds on all material points." <u>Banner Entm't v. Superior Court</u>, 62 Cal.App.4th 348, 358 (1998). The failure to reach a meeting of the minds on all material points prevents the formation of a contract even if the parties have orally agreed upon some of the terms, or have taken some action related to the contract. See <u>Grove v. Grove Valve & Reg. Co.</u>, 4 Cal.App.3d 299, 311-12 (1970).

In the instant case, Executive Risk contends that the element of mutual consent is demonstrated by the sequence of letters exchanged between Mauna Kea, ALY and Mason concerning ALY and DAP's request to assign its Project performance obligations to DAP. (Def.'s Mot. at 14-16.) Specifically, Executive Risk argues that Mason's March 27 letter to Mauna Kea constitutes an "offer" by Amoroso to provide a financial guarantee "for the liabilities of DAP," and that Mauna Kea "accepted" Amoroso's alleged "offer" in its follow up letter of May 24, 2001. (Def.'s Reply at 2-4.) According to Executive Risk, Mauna Kea's letter "evidences [its] understanding that [Amoroso] was offering to provide a guarantee relating to DAP's performance under the construction contract and that Mauna Kea accepted that offer." (<u>Id.</u> at 4.)

"'In order for acceptance of a proposal to result in the formation of a contract, the proposal must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain.'" Perfumebay.com Inc. v. EBAY, Inc., 506 F.3d 1165, 1178 (9th Cir. 2007) (quoting Weddington Prod., Inc. v. Flick, 60 Cal.App.4th 793, 811 (1998)); see also Cal. Civ.Code § 3390(5). Terms of a proposal are considered reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. Weddington Prod., 60 Cal.App.4th at 811. In contrast, if the putative contract "does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract." Id. No contract is formed unless "the precise act which is to be done is clearly ascertainable." Id. (internal quotations and citation omitted).

Applying the foregoing principles to the facts presented, the Court finds that Mason's March 27 letter does not constitute an offer. It is clear from the sequence and contents of the various letters that Mason did nothing more than respond to Mauna Kea's March 9, 2001 letter of inquiry. Mauna Kea's March 9 letter—which was addressed to ALY, not Amoroso—was Mauna Kea's initial response to DAP and ALY's request that Mauna Kea "consent to the assignment of the construction contracts from [ALY] to [DAP]." (Pl.'s RJN Ex. 54-7 at 65.) Specifically, Mauna Kea asked ALY to provide information "to help us [Mauna Kea] understand your request for assignment[.]" (Id.) In particular, Mauna Kea asked ALY, inter alia: (1) what was meant by the reference to "administrative segregation cost"; (2) whether the reason for the assignment was to insulate ALY and its principals from liability; (3) what assets DAP had; (4) whether ALY would continue as an ongoing entity; (5) whether ALY's intent was to use DAP from work other than completing the Project; and (6) whether DAP had the same "financial wherewithal" as ALY to protect the interest of Mauna Kea. (Id. at 65-66.) At no point in its letter did Mauna Kea request or demand that ALY or any other entity provide a guarantee of DAP's performance obligations in the event Mauna Kea provided its consent to the assignment.

On March 21, 2001, Mason, ostensibly on behalf of Amoroso, responded to Mauna Kea's request for information by answering each of Mauna Kea's questions. Among other things, Mason responded that "DAP's liability is assigned to both ALY and [Amoroso]," that ALY and Amoroso had combined assets in excess of $10 million, that the Project was secured by Amoroso's bonding capacity and that ALY and Amoroso's joint ownership of DAP made it a "financially strong entity." (Id. at 67.) Executive Risk asserts that these representations "can only be characterized as an objective manifestation of [Amoroso]'s willingness to be responsible for the liabilities of DAP and are akin to a surety or guaranty contract." (Def.'s Reply at 3.) The Court disagrees. California law defines both a guarantor and a surety as "one who promises to answer for the debt, default or miscarriage of another or who hypothecates property as security therefor." Cal.Civ.Code § 2787. Amoroso's letter evinces no such promises. Nor does Mason's letter recite "the precise act" Amoroso supposedly was offering to perform or "call for . . . definite terms in the acceptance." See Weddington Prod., 60 Cal.App.4th at 811. While Mason's responses appear to be an effort to persuade Mauna Kea that DAP was a financially viable entity so that it ultimately would consent to the proposed assignment, his representations cannot be reasonably construed as a "sufficiently definite" offer by Amoroso to assume liability for DAP's performance under construction contract. See id.[8]

Equally without merit is Executive Risk's ancillary contention that Mauna Kea's May 24 letter, which was addressed to both ALY and Amoroso, constitutes an "acceptance" of Amoroso's purported offer.[9] Executive Risk seizes upon statements in Mauna Kea's letter that it was consenting to the assignment based, in part, on the representations in Mason's March 27, 2001 letter. Executive Risk also points to Mauna Kea's statement of its "understanding that [DAP] will be backed by the combined strength of both [ALY] and [Amoroso] and the performance and payment bonds will remain in full force." (Id. at 68 (emphasis added).)

---

[8] Indeed, that is precisely what Mauna Kea had alleged in its First Amended Complaint; to wit, that ALY and Amoroso misrepresented to Mauna Kea the benefits of approving the assignment of the construction contract to DAP. (See Def.'s RJN Ex. A ¶ 86.)

[9] To the extent that Mauna Kea was accepting an offer by Amoroso to guarantee DAP's performance, it would not have addressed its "acceptance" letter to both entities.

Despite Executive Risk's assertions to the contrary, such statements cannot reasonably or objectively be construed to constitute an "acceptance" by Mauna Kea of an "offer" by Amoroso. Mauna Kea makes no reference to any "offer" or "guarantee" by Amoroso—nor is there anything in its letter even remotely suggesting that Mauna Kea was "accepting" such an offer. See Panagotacos v. Bank of Am., 60 Cal.App.4th 851, 855-56 (1998) ("[T]erms proposed in an offer must be met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract") (internal quotations and citations omitted). Indeed, Mason's letter is simply mentioned along with a number of other documents as the reason that Mauna Kea purportedly was comfortable in agreeing to approve ALY and DAP's request for approval of the proposed assignment.

### 2. "Agreement" to Approve the Assignment

Executive Risk next argues that even if the correspondence between Amoroso and Mauna Kea did not amount a contract or agreement to guarantee DAP's performance, such correspondence should be interpreted as an agreement to assign the construction contract from ALY to DAP. (Def.'s Opp'n at 14-15.) As a threshold matter, Executive Risk's argument impermissibly exceeds the scope of the Ninth Circuit's mandate. On remand, a district court has a duty to follow the appellate court's instructions as to how the case is to proceed. See Vizcaino v. U.S. Dist. Court for W. Dist. of Wash., 173 F.3d 713, 719 (9th Cir. 1999). The Court "must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." United States v. Montgomery, 462 F.3d 1067, 1072 (9th Cir. 2006) (internal quotations and citation omitted).

Here, Executive Risk contends that the Ninth Circuit's remand permits the consideration of whether the correspondence between Amoroso and Mauna Kea created any type of contract—and is not limited to the issue to whether the contract was one to guarantee DAP's performance. (Def.'s Opp'n at 7.) This ignores the "letter" of the mandate, which unequivocally states that "[o]n remand, the district court should consider whether . . . the letter correspondence amounted to a contract or agreement to Amoroso to, in effect, guarantee

DAP's performance of the construction contract." Slip Op. at 4. As such, Executive Risk's argument is not properly before the Court.

The above notwithstanding, Executive Risk's contention that the correspondence between Amoroso and Mauna Kea evidences a mutual assent to assign the construction contract from ALY to DAP is meritless. (Def.'s Opp'n at 14-15.) As noted, the construction contract between ALY and Mauna Kea expressly provided that <u>ALY</u> could assign its obligations under their agreement, provided that <u>Mauna Kea</u> gave its consent to the assignment. (Def.'s RJN Ex. 1.) It is undisputed that Amoroso was not a party to that agreement—a fact which the Ninth Circuit acknowledged in its opinion. Slip Op. at 3. As such, whether Amoroso "agreed" to the assignment is irrelevant, since it was Mauna Kea's decision to confer or deny its consent to the proposed assignment.

### 3. Summary

Based on the record presented, which is controverted by neither party, it is clear that the correspondence between Amoroso and Mauna Kea did not amount "to a contract or agreement by Amoroso to, in effect, guarantee DAP's performance of the construction contract." Slip. Op. at 4. Because Amoroso's alleged liability for Mason's misrepresentations did not arise from an oral or written agreement, Executive Risk cannot rely upon Exclusion III(C)(2) as a basis for denying coverage. Id. Accordingly, the Court grants Amoroso's and denies Executive Risk's respective motions for summary judgment as to Amoroso's first claim for breach of contract.

### B. BAD FAITH DENIAL OF DUTY TO DEFEND

The remaining aspect of the parties' cross-motions for summary judgment pertains to Amoroso's second claim for breach of the implied covenant of good faith and fair dealing (i.e., "bad faith"). As noted, the Ninth Circuit held that the Court properly granted summary judgment for Executive Risk to the extent that Amoroso's bad faith claim is predicated on the denial of coverage. However, the court remanded the bad faith claim based on Executive Risk's refusal to defend Amoroso in the Mauna Kea litigation. The mandate states: "Where there is an issue of liability, the insurer, as a matter of law, could not have acted in bad faith in

denying coverage. . . .  The district court, therefore, did not err in granting summary judgment to Executive Risk on Amoroso's claim of bad faith due to Executive Risk's denial of coverage. <u>We leave it to the district court to determine in the first instance whether Amoroso has stated a claim of bad faith based on a breach of the duty to defend, and if so, whether Amoroso should prevail on such a claim</u>."  Slip Op. at 4-5 (emphasis added).  As will be set forth below, the answer to both questions is "no."

It has long been the rule in California that every insurance policy contains an implied covenant of good faith and fair dealing that neither party will do anything to injure the other party's right to receive the benefits of the agreement.  <u>Comunale v. Traders & General Ins. Co.</u>, 50 Cal.2d 654, 658 (1958).  An insurer has a duty to defend an insured if the insurer becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under an insuring agreement.  <u>Waller v. Truck Ins. Exch., Inc.</u>, 11 Cal.4th 1, 19 (1995).  "[I]f an insurer unreasonably fails to defend, it has breached the implied covenant of good faith and fair dealing."  <u>Campbell v. Superior Court</u>, 44 Cal.App.4th 1308, 1319 (1996).  Conversely, "if there is no <u>potential</u> for coverage, and hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer."  <u>Waller</u>, 11 Cal.4th at 36 (emphasis in original).

Executive Risk correctly points out that Amororo's bad faith claim fails as a matter of law because Amoroso cannot show that it incurred any damages as a result of Executive Risk's refusal to defend because Amoroso's other carrier, St. Paul, paid all of its defense costs.  In <u>Emerald Bay Cmty. Ass'n v. Golden Eagle Ins. Corp.</u>, 130 Cal.App.4th 1078 (2005), the insured, a homeowner's association, was sued by two homeowners.  The association tendered the defense of the lawsuit to Golden Eagle Insurance Company ("Golden Eagle") and Federal Insurance Company ("Federal"), both of which had issued insurance policies to the insured. Federal accepted the tender and provided a defense, while Golden Eagle did not.[10]  On appeal,

_____

[10] Golden Eagle made a single payment to the insured's defense counsel, but later declined to provide the insured with a defense or indemnification.  <u>Id.</u> at 1083.

the court of appeal held that "where one insurer fully protects the insured by providing a defense and full coverage for a claim, a second insurer's refusal to defend generally cannot support a tort action for breach of the covenant of good faith and fair dealing because the latter's conduct will not enhance the insured's cost of defending itself or its exposure to liability." Id. at 1094.

In this case, Amoroso has admitted in its discovery responses that "[it] does not contend that [Executive Risk] is responsible for any defense costs incurred in the defense of Amoroso in the Mauna Kea Lawsuit," as the cost of defending the Mauna Kea lawsuit was borne by another insurance company. (See Kokes Decl. Ex. P at 32; Pl.'s Opp'n at 20.) Nonetheless, Amoroso argues that Emerald Bay is distinguishable because St. Paul, Amoroso's other insurer, accepted the tender of defense subject to a reservation of rights and disclaimed coverage for Mauna Kea's fifth cause of action for misrepresentation. (Pl.'s Opp'n at 20.) Such a distinction is inapposite. Under California law, an insurer has a duty to defend its insured against all claims alleged against its insured, provided that there is a potential for coverage with respect to at least one of the claims. State Farm General Ins. Co. v. Mintarsih, 175 Cal.App.4th 274, 283 (2009) (citing Buss v. Superior Court, 16 Cal.4th 35, 49 (1997)). Here, there is no dispute that St. Paul provided Amoroso with a complete defense as to all claims. As such, it is of no consequence that St. Paul reserved its rights with respect to one of Mauna Kea's claims. Moreover, Amoroso has made no showing that it suffered any damages as a result of St. Paul's reservation of rights.

Amoroso argues that even if it did not incur any costs in defending itself in the Mauna Kea litigation, it nonetheless sustained damage as a result of having paid $810,000 as part of the global settlement of the Mauna Kea litigation. (Pl.'s Opp'n at 20.) Amoroso claims that Executive Risk's denial of coverage left it "standing naked . . . against $30,000,000 in potential liability for misrepresentation," leaving it little choice but to settle with Mauna Kea. (Id.) The flaw in this argument is that it conflates an insurer's duty to defend with the duty to indemnify. "The general measure of damages for a breach of the duty to defend an insured, even if it is ultimately determined there is no coverage under the policy, are the costs and attorney fees

expended by the insured defending the underlying action." Emerald Bay, 130 Cal.App.4th at 1088. As discussed above, Amoroso did not incur any fees or costs in connection with the Mauna Kea action as a result of Executive Risk's failure to provide a defense. Because the Ninth Circuit has already determined that Executive Risk cannot be held liable for a bad faith breach of its duty to indemnify, the fact that Amoroso paid $810,000 (or some other amount) to settle the underlying action is irrelevant.

The sole case cited by Amoroso, Pruyn v. Agricultural Ins. Co., 36 Cal.App.4th 500 (1995), has no application here. In Pruyn, a homeowner sued a homeowner's association for property damage. The association tendered the defense of the action to its various insurers, all of which denied coverage and refused to provide a defense. As a result, the association entered into a stipulated judgment which it assigned to the homeowner in exchange for a covenant not to execute on the judgment. The homeowner (now standing in the shoes of the association) brought an action against the insurers to enforce the judgment. The trial court sustained the insurer's demurrers and motions for judgment on the pleadings, without leave to amend.

The California Court of Appeal reversed and held that the homeowner had alleged "sufficient facts which, if proven, would establish a basis for coverage under at least some of the several primary policies and that those insurers' refusal to provide a defense was wrongful." Id. at 514. The court explained that "[i]f an insurer, with notice of the pendency of the underlying action, wrongfully denied coverage or improperly refuses to provide its insured with a defense, then the insured is entitled to make a reasonable settlement of the claim in good faith and then maintain an action against the insurer to recover the amount of the settlement." Id. at 515 (internal quotations, alterations and citation omitted). Quoting the foregoing passage, Amoroso argues that like the insured in Pruyn, it too was deprived of a defense by its insurer and thus should be entitled to recover the settlement paid to Mauna Kea.

Amoroso's reliance on Pruyn is misplaced. The Pruyn court made it clear that its analysis was predicated on the procedural posture of the case, i.e., that it was accepting all of the facts alleged in the complaint as true. Notably, the court qualified its discussion by noting as follows: "We necessarily acknowledge that plaintiff's ultimate recovery against the insurers

will depend upon it being established that there was coverage and that the insurers, or at least some of them, were obligated to indemnify [the association] under their respective policies. Absent such an obligation, any recovery by plaintiff, based solely on a wrongful failure to defend [the association], may be limited to the costs of defense. Id. at 514 (emphasis added). If Amoroso's bad faith claim were based on the wrongful denial of coverage, Amoroso arguably would be entitled under Pruyn to recover the amount it paid to settle the Mauna Kea action. However, the Ninth Circuit affirmed summary judgment on that aspect of Amoroso's bad faith claim, thus limiting Amororo's bad faith claim to the failure to defend.[11] As a result, Amoroso's remedy for its wrongful failure to defend claim is limited to the recovery of its defense costs. Since St. Paul paid for Amoroso's defense, Amoroso cannot show that it suffered any damages as a result of Executive Risk's failure to provide a defense—even if such decision were unreasonable. Moreover, unlike the association in Pruyn, Amoroso was, in fact, provided with a defense, albeit by another insurer. Because Amoroso is unable to demonstrate any damages resulting from Executive Risk's wrongful failure to defend, summary judgment shall be granted in favor of Executive Risk on Amoroso's bad faith claim.

## IV.    CONCLUSION

For the reasons stated above, the Court finds that Amoroso is entitled to coverage under the Policy, and that Executive Risk is liable for breach of contract for failing to provide coverage to Amoroso in connection with the Mauna Kea litigation. However, Amoroso cannot prevail on its bad faith claim based on its failure to demonstrate damages. Accordingly,

//

//

//

//

//

//

---

[11] The settlement amount paid by Amoroso is recoverable as an element of its claim for breach of contract.

IT IS HEREBY ORDERED THAT:

1. Amoroso's motion for summary judgment is GRANTED and Executive Risk's motion for summary judgment is DENIED with respect to Amoroso's claim for breach of contract.

2. Executive Risk's motion for summary judgment is GRANTED and Amoroso's motion for summary judgment is DENIED with respect to Amoroso's claim for breach of the implied covenant of good faith and fair dealing.

3. Judgment shall be entered consistent with this Order. The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.

Dated: December 11, 2009

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge